# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
                                                              )
**EQUAL EMPLOYMENT OPPORTUNITY**            )
**COMMISSION,**                                             )
                                                              )
     **Plaintiff,**                                  )
                                                              )    **Civil Action No.**
     **v.**                                         )    **13-11503-FDS**
                                                              )
**CHIPOTLE MEXICAN GRILL,**                      )
                                                              )
     **Defendant.**                                 )
_____)


## MEMORANDUM AND ORDER ON
## MOTION FOR SUMMARY JUDGMENT AND MOTION FOR SANCTIONS

**SAYLOR, J.**

     This is an action brought by the Equal Employment Opportunity Commission on behalf of Amanda Connell, a former employee of defendant Chipotle Mexican Grill. The EEOC alleges that defendant terminated Connell due to her disability in violation of the Americans with Disabilities Act ("ADA"). Defendant contends that Connell was terminated for a non-discriminatory reason—specifically, that she was seen on video treating a customer disrespectfully. The relevant video footage no longer exists.

     Defendant has moved for summary judgment on the ground that the EEOC has presented no direct or indirect evidence of discrimination. The EEOC has cross-moved for sanctions, contending that defendant's failure to preserve the video footage constitutes spoliation of evidence. For the following reasons, both motions will be denied.

# I.     Background

## A.     Factual Background

The following facts are undisputed unless otherwise noted.

Defendant Chipotle Mexican Grill is a chain of "fast casual" restaurants that specializes in Mexican food.  (Def's SMF ¶ 1).  Chipotle operates a restaurant located at 5 Franklin Village Drive in Franklin, Massachusetts.  (*Id.*).  The Franklin Village restaurant opened on December 15, 2011.  (*Id.* ¶ 2).

On November 18, 2011, in advance of the restaurant's opening, Chipotle manager Corey Routh interviewed Amanda Connell for a crew-member position at the Franklin Village restaurant.  (*Id.* ¶ 7).[1]  During the interview, Connell told Routh that she suffered from cystic fibrosis.  (*Id.* ¶ 8).  According to Connell, Routh told her:  "No one's going to look at you any different than you look at yourself.  And no one's going to judge you by your issue.  And as long as it doesn't affect your job performance, there should be no problem."  (*Id.*).  Connell and Routh also discussed the concept of customer service; Connell understood from the conversation that customer service was important to Chipotle.  (*Id.* ¶ 12).  Routh hired Connell as a crew member—specifically, as a cashier and front-line worker.  (*Id.* ¶ 10).

At Chipotle restaurants, front-line workers assemble burritos and prepare other food items at the customer's direction and in their presence.  (*Id.* ¶ 14).  At the Franklin Village restaurant, between one and three employees typically work on the front line at any given time, fulfilling one or more of the following roles:  tortilla station, salsa station, expediter, and cashier.  (*Id.* ¶ 18).  Each of these roles requires substantial customer interaction.  Chipotle's job

_____

[1] Routh's official title was "restaurateur."  (SMF ¶ 3).  As of December 18, 2011, he was responsible for overseeing three Chipotle restaurants, including the Franklin Village restaurant.  (*Id.* ¶¶ 3-4).

description for a front-line worker specifies that a line server "[h]as passion, energy, persistence, positive attitude and enthusiasm" and "[i]s passionate about delivering a great experience to our customers." (*Id.* ¶ 20; Line Server Job Description at 2).[2]

As noted, the restaurant opened on December 15, 2011. According to Routh and Christopher Bennett, a Chipotle Apprentice Manager, Chipotle received numerous complaints about Connell within the first few months of her employment. The complaints concerned her attitude and poor customer service, and came from both from customers and fellow employees. (*Id.* ¶ 24).[3] Bennett testified:

> Once in a while I would have a crew member pull me aside, insulted by how they were spoken to, and once in a while the same thing with customers . . . . For example, one person pulled me aside and asked me if there were any—if there was anything that I could do for this employee, because she seemed a little agitated. Another time a customer pulling me aside and being very verbal about how insulted they were and how they were treated on the line.

(Bennett Dep. at 18-19). He further testified that "[A]s an employee besides that, she was great. She worked well. I don't recall any issues aside from the attitude part." (*Id.* at 18).

Connell described working with Bennett as follows: "He was an awesome boss. He treated you how he wanted to be treated. And he was always there to lend a helping hand if you needed it. Any questions you had, you could go to him. He was like your best friend but your boss at the same time. . . ." (Connell Dep. at 78). She went on to say that she felt like he treated

---

[2] On November 30, 2011, Connell signed a form acknowledging receipt and review of Chipotle's Crew Handbook, which includes the "basic expectation" that crew members "treat fellow employees and customers with respect." (SMF ¶ 21).

[3] Bennett testified that he could not specifically recall receiving a complaint about any other employee. (Bennett Dep. at 37). He also testified that he could not identify the subject employee in every customer complaint, and that "it's possible in some of the e-mails the 'she' could have been her. It's possible it could have been someone else." (*Id.* at 77).

employees equally and did not discriminate against any employee, including herself.  (*Id.* at 79).[4]

Routh testified that on one occasion in mid-January 2012 he personally witnessed what he perceived to be a lack of enthusiasm from Connell while working on the line.  He further testified that after the incident, he asked Bennett and Jonathan Drew, the Service Manager, to give Connell a verbal warning by "sit[ting] down and hav[ing] a conversation and remind[ing] her of our expectations as far as customer service is concerned."  (Routh Dep. at 76).

According to Routh, the restaurant received an e-mail complaint about Connell at some point at the "end of January [or] somewhere in February [2012]."  (Routh Dep. at 72-73).  At that point, Routh met with Bennett and Drew, and the three of them determined that "she was going to be written up over the last complaint."  (Routh Dep. at 78).

On March 2, 2012, Bennett issued a written warning to Connell.  The warning stated as follows, in a section labeled "Facts":

> We as a restaurant have received customer complaints, both in person and via phone calls, that regarded Amanda and the way she would speak to customers while they were getting served.  They described these occurrences as Amanda being disrespectful and short-tempered.  We have had fellow employees confirm these instances with management.

(Warning at 1).  It also advised:

> Any further infraction of the above-mentioned incident, or any other infraction, may result in additional corrective action, up to and including termination.

---

[4] Connell described working with Drew as follows: "It was not fun at all.  He made you feel so low, and he would talk to you as though he was better than you.  And he was just not helpful at all with anything." (Connell Dep. at 79-80).

.

(*Id.* at 2).  Connell signed the bottom of the form.  (*Id.*).[5]

On March 23, 2012, a customer submitted an on-line complaint about the service she had received at the Franklin Village store.  (*Id.* ¶ 58).  She wrote that on March 11, 2012, a female crew member working at the salsa section of the front line had treated her rudely and embarrassed her and that, as a result, she had resolved never to return to Chipotle.  (*Id.* ¶ 59).  The complaint stated, in relevant part:

> As I went down the line I encountered a girl who already had a scowl on her face.  She asked me a question which I could not understand I said "I'm sorry?" to ask her to repeat herself and she dumped a scoop of salsa on my burrito.  I stopped her and told her I didn't want salsa only chicken rice and cheese.  She has quite the attitude and told me "well you should have said that.  I asked if you wanted it spicy or not and you said no so I added salsa".  I told her 1. I could not hear her and asked her to repeat herself and 2. Just because I didn't want it spicy didn't mean I wanted salsa.  She informed me that "that's how it works at Chipotle" and then continued to complain to her co-workers that they needed to remake my burrito because I messed up my order.  I kept calm though I was extremely angry and embarrassed by how she was treating me.  I paid for my food and left.  Though the food was quite good I can assure you I will not be returning to that Chipotle or any for that matter.  To be treated so rudely and to be embarrassed and for that to be "the way it works at Chipotle" - unacceptable.  I can get quality food at many other places without the disrespect I received at your establishment.

(Callaghan Complaint at 1-2).

The on-line complaint form permitted the customer to enter both the date and time of the visit to the restaurant.   It appears that the information entered by the customer was then

---

[5] The warning also contained the following language, in a section labeled "Objectives":

There is to be absolutely no rudeness or shortness with customers.  We take pride in our customer service and we do our best to accommodate wherever possible.  The Customers are the reason we are able to work at Chipotle.  It is unacceptable to snap or be rude to ANYONE.  We are here to provide a warm and welcoming environment, and to produce the highest quality customer service with smiles and bubbly personalities.

(Warning at 1).  Connell testified that after receiving the written warning she understood that if she was rude to customers again she could be terminated.  (Connell Dep. at 101).

supplemented or modified by Chipotle's computer systems, in order to create a document for management purposes. Among other things, the internal Chipotle document generated by that process has separate fields for "Date of Visit" and "Date of Visit as Entered."

The internal document generated by the customer complaint at issue indicates "3/11/2012 7:00 AM" as the "Date of Visit" and "03/11/2012  06:00" (with no indication of a.m. or p.m.) as the  "Date of Visit as Entered."  (Callaghan Complaint at 1).[6]

On March 27, 2012, Connell underwent a medical procedure in which a peripherally inserted central catheter ("PICC line") was inserted through a vein in her arm to help manage her condition.  (Def's SMF ¶ 43).  The exterior portion of the PICC line in her arm was covered by a mesh bandage.  (*Id.* ¶ 44).

Connell's first day of work after the PICC line was installed was March 29, 2012.  (*Id.* ¶ 45).  During most of her shift on that day, Connell's work shirt covered the bandage.  (*Id.* ¶ 47). However, at some point near the middle of her shift, she extended her arm in an attempt to grab something and the sleeve of her shirt lifted, causing the bandage to briefly become visible.  (*Id.* ¶ 50).  As a result, Drew saw the bandage on her arm and asked her about it.  (*Id.* ¶ 51). According to Connell, Drew had a "disgusted" look on his face throughout their conversation

---

[6] The distinction between the "Date of Visit as Entered" and "Date of Visit" is far from clear.  The section called "Date of Visit as Entered" appears directly below the section called "Date of Visit" on the internal form.  An examination of other complaints lodged in the same time period (attached by defendant as exhibit 19 to its statement of undisputed material facts) reveals that the time shown next to "Date of Visit as Entered" consistently appears in military form, with 06:00 apparently representing 6:00 a.m. and 18:00 representing 6:00 p.m.  (*See, e.g.*, Salesforce Complaints at 1 (Santolucito Complaint)).  All but three of the complaints on the record show an equivalent standard (12-hour clock) time next to "Date of Visit," but three (including the subject complaint) show a one-hour increase from the time next to "Date of Visit as Entered" to the time shown next to the "Date of Visit."  The three that show a one-hour increase are the only three that report incidents occurring on March 11, 2012, or later—the other complaints show dates ranging from December 15, 2011, to March 3, 3012.  In 2012, Daylight Saving Time began in the United States on March 11.

about the PICC line.  (*Id.* ¶ 52).[7]

The parties appear to dispute whether Bennett also saw the bandage during the conversation between Connell and Drew.  Connell testified at her deposition that Bennett walked by as she was talking to Drew, and that she showed him the bandage and told him about it.  (Connell Dep. at 118, 130).  She described Bennett's reaction as follows:  "He's like 'Okay.  Well, hope you feel better.  He kept walking.  He didn't really care."  (*Id.* at 118).  Bennett testified that he did not recall ever seeing a bandage on Connell's arm.  (Bennett Dep. at 31).[8]

At the end of her shift on March 29, 2012, Connell approached Drew to tell him that she would be late for work the next day, because she needed to have blood drawn.  (Def's SMF ¶ 57).  According to Connell, Drew told her that was "perfectly fine."  (*Id.*).

---

[7] Connell testified at her deposition that Drew "had, like, this face like 'There's something wrong with you, and I don't know how to go about talking about it.'"  (Connell Dep. at 117).

[8] Connell sent an e-mail to the EEOC February 1, 2013, that gave a somewhat different version of events.  That e-mail read as follows:  "They did indeed see the Picc line the day before I got the Picc line and asked what it was and I told them and they had no problem with it.  Chris Bennett was not aware of the Picc line being in my arm because I did my best to hide it at work.  Chris was there when John Drew saw it but after me and John [Drew] talked, no other words were spoken about it to anyone.  Knowing John Drew, he probably did tell Chris Bennett about my Picc line when I wasn't there."  (Connell e-mail to Charles Jordan at 1).

At an earlier point in her deposition, Connell was asked about that e-mail and appeared to reaffirm that Bennett did not see the PICC line:

> Q.     Okay.  Based on your e-mail, it sounds like your opinion is that Chris Bennett did not see your PICC line on the 29th.  Is that fair to say?
>
> A.     Yes.
>
> Q.     And that's your understanding is that he did not see the PICC line or the bandage?
>
> A.     Yes.
>
> Q.     Chris Bennett?
>
> A.     Yes.

(Connell Dep. at 111).

The March 23 electronic customer complaint was received and reviewed by Heather Sipos, a Chipotle customer service representative. (*Id.* ¶ 60). Sipos sent a response to the customer. (*Id.*). On March 29, 2012, she forwarded the e-mail chain to Christopher Baglieri, Routh's supervisor. (Id. ¶ 62). Baglieri forwarded the chain to Routh. (*Id.* ¶ 63).

Routh received the e-mail chain, including the customer complaint, on March 30, 2012. Upon reading the complaint, Routh determined that the employee referred to—whose identity was, to that point, unknown—should be terminated. (*Id.* ¶ 64). On March 30, he forwarded the chain of e-mails that included the customer complaint to the e-mail address for the Franklin Village restaurant. (*Id.* ¶ 65). Within that e-mail, he instructed: "We need to find out who this was and they need to be terminated." (*Id.* ¶ 66). Bennett received, or at least read, the e-mail.

As noted, the customer complaint seems to indicate that the incident occurred at either 6:00 or 7:00 a.m. on March 11, and that it occurred in the salsa section. The e-mail version of the complaint, which was included in the chain reviewed by Routh and Bennett, indicated that the incident had occurred at 7:00 p.m. On March 11, the Franklin Village restaurant was open from 11:00 a.m. to 11:00 p.m. (Dkt No. 71, Ex. N).[9]

On March 11, Connell worked from 8:29 a.m. to 4:23 p.m. (Def's SMF ¶ 83). She was the only employee expressly scheduled to work the salsa section on that date. (*Id.* ¶ 82).

Chipotle restaurants are equipped with security cameras, using a system called Envyson.

---

[9] As noted above, the times listed next to "Date of Visit as Entered" on Chipotle on-line complaint forms consistently appear in military form, with 06:00 representing 6:00 a.m. and 18:00 representing 6:00 p.m. Many (but not all) of the on-line complaints lodged with Chipotle during Connell's employment appear to indicate times of visit that fall outside of the restaurant's normal business hours (11:00 a.m. to 10:00 p.m.)—for example, 01:05; 01:40; 02:45; 04:00; 05:00; 05:25; 05:45; 07:30; and 23:00 (twice). (Def's SMF ¶ 80). Because the complaint form was electronic, it is a reasonable inference that the discrepancies were due to confusion on the part of customers who were not familiar with the military clock.

(Def's SMF ¶ 69).  One of the security cameras at the Franklin Village restaurant was placed above the cash register and captured the activities of the front-line employees.  (*Id.* ¶ 73).  The cameras do not record sound.  (*Id.* ¶ 72).

According to Chipotle, the cameras can store video footage for approximately thirty to sixty days before the system automatically records over older footage; in some cases, the video may be available up to ninety days.  The period varies depending on the amount and content of the footage on the drive.  (*Id.* ¶ 70; Letter of May 7, 2013, at 2).

According to Bennett, after he read Routh's e-mail he began reviewing the video footage of the front-line employees from March 11, in an effort to determine the identity of the employee mentioned in the customer complaint.  (*Id.* ¶ 68).  Bennett testified that he began by reviewing the footage recorded near 7:00 p.m., but later broadened his search to include other times on the same day.  (*Id.* ¶ 75).  Eventually, he identified Connell as the employee in question.  (*Id.* ¶ 84).  He described his rationale in making that determination as follows:  "The way her body language and facial expression with a customer on the line played out matched up well to what a customer had described in th[e] e-mail."  (*Id.*).  He testified that he spent a total of thirty to sixty minutes reviewing the footage.  (*Id.* ¶ 74).

Bennett testified that after he watched the video, he showed it to another manager (whose identity he could not definitively recall) to verify his interpretation.  (Bennett Dep. at 24).[10]  At

---

[10] Asked to whom he showed the video, Bennett initially testified:  "If I can recall correctly, I believe I showed it to either one of my other managers, I can't remember who, to verify that that makes sense."  (Bennett Dep. at 24).  He was then asked if the manager to whom he showed the video was Routh or Drew; he testified:  "If it was one of them, I would probably be able to recollect it.  I don't think it was one of them."  (*Id.* at 25).

In its position statement to the EEOC, Chipotle indicated that Drew personally reviewed the footage.  (Chipotle Position Statement at 6) ("Mr. Drew, having reviewed the relevant surveillance video and determined that Charging Party was responsible for the customer mistreatment described above, informed Charging Party that he needed to speak with her regarding her employment.").  Later in Bennett's deposition, after being shown that portion

that point, he and Drew called Routh and told him that they had identified Connell as the subject of the customer complaint. Routh then confirmed that they should terminate Connell. (Routh Dep. at 95, 122).

Drew had arrived for work at 2:00 p.m. on March 30, 2012. (Def's SMF ¶ 89). At 2:35 p.m., he e-mailed Baglieri and wrote: "Chris and I have researched [Envysion] about the negative customer comment we received from March 11th, and we discovered who the culprit was. We have processed Amanda Connell's termination form and will be having our final conversation with her when she arrives at 3pm." (Dkt. No. 71, Ex. U). Baglieri responded at 2:46 p.m., copying Routh on the e-mail, and wrote: "Really nice job guys. Thank you Jon for the detailed email and follow up." (*Id.*).

On March 30, 2012, Connell arrived for work at 3:28 p.m. (*Id.* ¶ 98). Upon her arrival, Drew sat down with her and told her that she was being terminated. He explained that Chipotle had received an e-mail from a customer who said that an employee had been rude to her and they had identified her as the subject employee by reviewing the video. (*Id.* ¶ 98). Connell did not respond to Drew, but simply took her last check from him and clocked out. (*Id.* ¶ 99).

On April 18, 2012, Connell filed a charge of discrimination with the EEOC. In it, she

---

of the position statement, Bennett was asked the following questions and gave the following responses:

> Q.    Now, after reading this paragraph, do you believe that you showed the video to Jonathan Drew?
>
> A.    Yes.
>
> Q.    And so before instructing Mr. Drew to inform Mr. Baglieri that you all had looked at it, you made sure that Jonathan Drew saw the video, correct?
>
> A.    Yes.

(Bennett Dep. at 45-46). Drew, for his part, testified that he did not personally review the footage and that his only knowledge of Connell's having been the subject of the complaint came from what Bennett had told him. (Drew Dep. at 23, 52).

wrote that "Jonathan Drew and Christopher Bennett were responsible for [her] removal from the workforce." (Connell Charge at 1).

On April 25, 2012, EEOC investigator Charles Jordan attempted to send a notice of the charge to Chipotle by first-class U.S. mail. The notice requested that Chipotle respond with a position statement by May 25, 2012, to EEOC investigator Charles Jordan. The notice also informed Chipotle of its recordkeeping and reporting obligations under Title 29, Part 1602 of the Code of Federal Regulations. It specifically excerpted 29 C.F.R. § 1602.14, which among other things requires employers faced with a charge of discrimination under the ADA to "preserve all personnel records relevant to the charge . . . until final disposition of the charge."[11]

The notice of charge was mailed to an incomplete address.[12] According to Chipotle, it never received the notice. (Milligan Aff. ¶ 4). According to Jordan, the EEOC never received any returned mail or other notice of delivery failure with respect to the notice. (Jordan Aff. ¶ 7).

On May 29, 2012, having received no response from Chipotle, Jordan contacted the Franklin Village restaurant by telephone. He left a message with a female employee who had answered the telephone, asking her to instruct her managers to provide a position statement or otherwise respond to the notice of charge. (*Id.* ¶ 8). Jordan stated the he did not receive a

---

[11] The regulation also directs more generally that "[a]ny personnel or employment record made or kept by an employer . . . shall be preserved by the employer for a period of one year from the date of the making of the record or the personnel action involved, whichever occurs later." 29 C.F.R. § 1602.14. EEOC did not include that portion of the regulation in its notice.

[12] Jordan sent the notice to the following address:

CHIPOTLE MEXICAN GRILL
FRAKLIN VILLAGE DRIVE
FRANKLIN, MA 02038

(Notice of Charge of Discrimination at 1). The address of the Franklin Village store is 5 Franklin Village Drive, with the same city, state, and zip code as above. Chipotle also has a designated agent for service of process located in Boston, Massachusetts.

response to that telephone call.  (*Id.* ¶ 9).

The security video footage was not preserved.  As noted, the footage typically would have been overwritten as soon as thirty days after March 11 (that is, by April 10, 2012) or as late as sixty days after March 11 (that is, by May 10, 2012).  It is possible that the footage may have been available as long as ninety days later (that is, by June 9, 2012).

On July 17, 2012, Jordan again contacted the Franklin Village restaurant by telephone. (*Id.* ¶ 10).  On that occasion, he spoke with a male employee who identified himself as a manager.  The manager asked that Jordan fax a copy of the notice of charge.  (*Id.*).  Jordan did so later on that same day.  (*Id.*).  According to Chipotle, the telephone call and subsequent fax on July 17, 2012, represented the first time that it received the notice of the charge.

### B.      **Procedural Background**

Plaintiff EEOC filed its complaint in this Court on June 24, 2013.  On August 14, 2014, after the completion of discovery, plaintiff moved for sanctions due to defendant's alleged spoliation of the video footage from March 11, 2012.  Defendant has now moved for summary judgment.

## II.      **Legal Standard**

The role of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."  *Mesnick v. General Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991) (internal quotation marks omitted).  Summary judgment is appropriate when the moving party shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "Essentially, Rule 56[] mandates the entry of summary judgment 'against a party who fails to make a showing sufficient

to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Coll v. PB Diagnostic Sys.*, 50 F.3d 1115, 1121 (1st Cir. 1995) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). In making that determination, the court must view "the record in the light most favorable to the nonmovant, drawing reasonable inferences in his favor." *Noonan v. Staples, Inc.*, 556 F.3d 20, 25 (1st Cir. 2009). When "a properly supported motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (footnotes omitted). The non-moving party may not simply "rest upon mere allegation or denials of his pleading," but instead must "present affirmative evidence." *Id.* at 256-57.

## III.   Analysis

### A.   Plaintiff's Motion for Sanctions

#### 1.   Alleged Spoliation of Evidence

The EEOC has moved for sanctions based on spoliation of evidence. Specifically, it contends that defendant engaged in spoliation by failing to preserve the March 11, 2012 video footage that led to Connell's termination. The EEOC has requested exclusion of all evidence related to the video, both at trial and in connection with defendant's motion for summary judgment. It also seeks an adverse inference that the contents of the video would not support Chipotle's contention that it terminated Connell based on review of the footage.

"[S]poliation is the intentional, negligent, or malicious destruction of relevant evidence." *Townsend v. Am. Insulated Panel Co., Inc.*, 174 F.R.D. 1, 4 (D. Mass. 1997). A finding of spoliation requires: "1) an act of destruction; 2) discoverability of the evidence; 3) intent to

destroy the evidence; and 4) occurrence of the act after commencement of litigation or, if before, at a time when the party was on notice that the evidence might be relevant to potential litigation." *Gordon v. DreamWorks Animation SKG, Inc.*, 935 F. Supp. 2d 306, 313 (D. Mass. 2013) (citing *McGuire v. Acufex Microsurgical, Inc.*, 175 F.R.D. 149, 154 (D. Mass. 1997). In general, an adverse inference based on spoliation "usually makes sense only where the evidence permits a finding of bad faith destruction; ordinarily, *negligent* destruction would not support the logical inference that the evidence was favorable to the defendant." *United States v. Laurent*, 607 F.3d 895, 902 (1st Cir. 2010) (emphasis in original). However, "mere negligence in the destruction of evidence" can sometimes be "sufficient to merit sanctions." *Citizens for Consume v. Abbott Laboratories*, No. 01-12257, 2007 WL 7293758, at *7 (D. Mass. Mar. 26, 2007) (citing *Sacramona v. Bridgestone/Firestone Inc.*, 106 F.3d 444, 447 (1st Cir. 1997)).

Here, the video footage was apparently erased through an automatic process at some point between thirty and sixty days after its creation (between April 10 and May 10, 2012) or possibly as late as ninety days later (by June 9, 2012). There is no dispute that on April 25, 2012, the written notice of charge was mailed to an incomplete address. It is disputed whether the notice of charge was actually received by Chipotle. EEOC investigator Jordan has stated that he contacted the Franklin Village restaurant by telephone on May 29, 2012, but defendant denies having been aware of this communication. There is no dispute that Chipotle received the notice no later than July 17, 2012.

Under the circumstances, the EEOC has not met its burden to demonstrate that the destruction occurred "at a time when the party was on notice that the evidence might be relevant to potential litigation." *See Gordon*, 935 F. Supp. 2d. at 313. Plaintiff sent the notice to an

address that was incomplete; the Court cannot simply assume that it was received shortly after April 25, 2012. Nor is there evidence that any managing employee of defendant became aware of the discrimination charge as a result of the telephone call apparently placed by Jordan on May 29, 2012. Indeed, even assuming that defendant gained notice of the charge in late April or late May, there is no evidence that the footage still existed at that time. According to the record, it may have been overwritten as early as April 10.

The EEOC, however, contends that a federal labor regulation, 29 C.F.R. § 1602.14, imposed an affirmative duty on defendant to preserve the relevant video footage regardless of whether it had notice of the charge. That regulation states:

> Any personnel or employment record made or kept by an employer (including but not necessarily limited to requests for reasonable accommodation, application forms submitted by applicants and other records having to do with hiring, promotion, demotion, transfer, lay-off or termination, rates of pay or other terms of compensation, and selection for training or apprenticeship) shall be preserved by the employer for a period of one year from the date of the making of the record or the personnel action involved, whichever occurs later.

29 C.F.R. § 1602.14. The regulation thus imposes a duty on employers to preserve "personnel or employment record[s] . . . having to do with . . . termination" for one year after an involuntary termination. *Id.* Plaintiff contends that the video footage is such a record, and that defendant therefore had a duty to preserve it even before it received notice of Connell's charge of discrimination. According to plaintiff, the regulation essentially provides employers with constructive "notice that the evidence [specified within the regulation] might be relevant to potential litigation." *See Gordon*, 935 F. Supp. 2d. at 313; *see also EEOC v. Am. Nat. Bank*, 652 F.2d 1176, 1195 (4th Cir. 1981) ("The affirmative obligation imposed by § 1602.14(a) to preserve records was clearly designed to protect Title VII plaintiffs from an employer's

destruction of possibly damaging evidence.").  Plaintiff further contends that the "intent to destroy" prong of spoliation is presumptively met where defendant disregarded a preservation duty imposed by a federal regulation.

The plain language of 29 C.F.R. § 1602.14 does not specify whether surveillance video footage qualifies as a "personnel or employment record."  Authority on this point is sparse, and it is mixed.  *Compare Abdulahi v. Wal-Mart Stores East, L.P.*, No. 12-4330, 2014 WL 7448533, at *2 (N.D. Ga. Dec. 18, 2014) (finding that § 1602.14 imposed a duty to preserve surveillance video footage that had contributed to a termination decision) *with EEOC v. New Breed Logistics*, No. 10-2696, 2012 WL 4361449, at *7 (W.D. Tenn. Sep. 25, 2012) (finding, "[b]ased on the court's reading of the plain language of the regulation," that a surveillance video that had contributed to a termination decision did "not fall within the personnel records covered by § 1602.14").

Here, the video footage was not a "personnel or employment record" in any usual sense of the term; instead, it was simply evidence of an employee action (rudeness to customers) on which a personnel decision (termination) was based.  The EEOC thus seeks to interpret the term "personnel or employment record" to include not only employment records kept in the ordinary course, but evidence of actions by employees on which personnel or employment decisions were based.

Such an interpretation, however, would stretch the meaning of "personnel or employment record" well beyond any ordinary meaning of the words.  Furthermore, it would be extremely difficult for employers to implement in practice, and would lead to considerable uncertainty as to

the scope of the employer's duty to preserve records.[13]  For those reasons, the Court declines the invitation to interpret § 1602.14 as requiring preservation of all evidence of employee work performance as "personnel or employment records."

Moreover, the uncontroverted evidence indicates that the surveillance footage was erased automatically and not through any intentional act on the part of defendant.  In the absence of clear authority requiring an employer to preserve such video footage, there is no basis on which to conclude that defendant allowed the footage to be destroyed in knowing or negligent dereliction of its regulatory obligations.  For that reason, plaintiff has not demonstrated that the footage was destroyed "with a culpable state of mind."  *See Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 109 (2d Cir. 2001); *cf.* Fed. R. Civ. P. 37(e) ("Absent exceptional circumstances, a court may not impose sanctions under these rules on a party for failing to provide electronically stored information lost as a result of the routine, good-faith operation of an electronic information system.").

To be clear, employers do not have free license to destroy evidence.  The spoliation doctrine remains in force, and an employer who intentionally destroys evidence that is relevant to a known claim does so at its peril.  Further, a prudent employer might well choose to preserve a copy of video footage if it forms the basis of an employee action.  Here, however, the preservation requirements of § 1602.14 do not apply, and a finding of spoliation is not warranted.

---

[13] Suppose, for example, that an office employee had been fired for poor performance that occurred over several years.  The employee's performance reviews are obviously personnel records that must be preserved under the regulation.  But what about the underlying evidence supporting that claim of poor performance?  Surely the company need not preserve every e-mail or rough draft of every document that the employee created as a purported "personnel record," simply because the documents may someday constitute evidence of poor performance.

Accordingly, plaintiff's motion for sanctions based on spoliation of evidence will be denied.

## 2.      Alleged Violations of Local Rules

Defendant separately contends that the motion for sanctions should be denied, regardless of its merits, on the basis of three violations of this Court's Local Rules. First, it contends that the EEOC violated Local Rule 7.1 in failing to contact defense counsel in an attempt to resolve or narrow the issues presented by the motion. *See* Loc. R. 7.1(a)(2) ("No motion shall be filed unless counsel certify that they have conferred and have attempted in good faith to resolve or narrow the issue."). Second, it contends that the EEOC violated Local Rule 37.1(a), which requires that, [b]efore filing any discovery motion, including any motion for sanctions . . . , counsel for each of the parties shall confer in good faith to narrow the areas of disagreement to the greatest possible extent." Finally, it contends that the motion is deficient in that it does not follow Local Rule 37.1(b), which mandates specific content that must be included in a motion filed by a party that has attempted and failed to narrow the issues via a discovery conference. Defendant further seeks attorneys' fees as a sanction for the rules violations.

The EEOC disputes defendant's contention that it violated the local rules—it contends that it attempted to confer with defense counsel prior to the filing of the motion and received no response, and it further contends that Local Rule 37.1 does not apply to a motion for sanctions based on spoliation, because it is not a "discovery motion." (Pl. Reply at 6-7; Coleman Supp. Dec. ¶¶ 3-9).

Because the motion for sanctions is subject to denial on another ground, there is no need to decide whether it would also be subject to dismissal based on any violations of the Local

Rules. Further, even if the EEOC did fail to confer with defendant prior to filing the motion, it does not appear that any of the issues in contention could have been resolved or narrowed by such a conferral, as defendant opposes plaintiff's motion in its entirety. For that reason, and although the Court expects counsel to follow the rules in the future, the Court will not award attorneys' fees to defendant.

## B. Defendant's Motion for Summary Judgment

To establish disability discrimination under the ADA, the EEOC must prove that Connell "(1) was disabled within the meaning of the ADA, (2) was able to perform the essential functions of the job with or without reasonable accommodation, and (3) was discharged by the employer in whole or in part because of his disability." *Rosado v. Wackenhut Puerto Rico, Inc.*, 160 F. App'x 5, 10 (1st Cir. 2005). It may prove the third element, discriminatory discharge, through direct or indirect evidence. *Id.* Direct evidence of a discriminatory motive is "relatively rare"; when it exists, it "serves to shift the burden of persuasion from employee to employer." *Smith v. F.W. Morse & Co., Inc.*, 76 F.3d 413, 421 (1st Cir. 1996).[13]

If direct evidence is lacking, a plaintiff may prove her case indirectly "by using the *prima facie* case and burden shifting methods that originated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973)." *Jacques v. Clean-Up Group*, 96 F.3d 506, 511 (1st Cir. 1996) (quoting *Katz v. City Metal Co., Inc.*, 87 F.3d 26, 30 n.2 (1st Cir. 1996)). In order to prove a *prima facie* case, the typical plaintiff must demonstrate that the terminated employee "was replaced by a non-disabled person or treated less favorably than non-disabled employees" and that she suffered damages as a result. *Ramos-Echevarria v. Pichis, Inc.*, 659 F.3d 182, 186 (1st

---

[13] *Smith* arises under Title VII, not the ADA, but "the ADA is interpreted in a manner similar to Title VII." *EEOC v. Amego, Inc.*, 110 F.3d 135, 145 n.7 (1st Cir. 1997).

Cir. 2011) (citing *Jacques*, 96 F.3d at 511)). However, "[b]ecause employment discrimination cases arise in a variety of contexts, the *prima facie* elements must be tailored to the given case." *Rodriguez-Torres v. Caribbean Forms Manufacturer, Inc.*, 399 F.3d 52, 58 (1st Cir. 2005) (citing *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512) ("[T]he precise requirements of a prima facie case can vary depending on the context and were never intended to be rigid, mechanized, or ritualistic." (internal quotation marks omitted)).

Upon a *prima facie* showing, the burden of production shifts to defendant to articulate "a legitimate, nondiscriminatory reason for the adverse employment decision." *Dichner v. Liberty Travel*, 141 F.3d 24, 29-30 (1st Cir. 1998) (citing *Cumpiano v. Banco Santander P.R.*, 902 F.2d 148, 153 (1st Cir. 1990)). Once defendant has put forth a nondiscriminatory explanation for its termination, the burden is on plaintiff to "prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000) (quoting *Texas Dep't of Comm'y Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). If a plaintiff proves her case through indirect evidence, it retains the burden of persuasion to prove discrimination "at all times." *Dichner*, 141 F.3d at 30.

As an initial matter, defendant does not appear to contest the fact that Connell was disabled within the meaning of the ADA or that she was able to perform the essential functions of her job without reasonable accommodation. It is also not disputed that defendant was, at all relevant times, a covered employer under the ADA. The question, then, is whether she was discharged because of her disability.

The EEOC does not appear to have any direct evidence of discrimination. The only

evidence it cites as "arguably" direct is the allegedly "disgusted" facial expression that Connell says Drew gave her after she showed and described her PICC line to him. (Pl. Opp. at 8 n.2). But that kind of evidence—Connell's subjective interpretation of another person's facial expression—is not remotely sufficient, standing alone, to show direct evidence of discrimination. *See Smith*, 76 F.3d at 421 (providing as an example of direct evidence "an admission by the employer that it explicitly took actual or anticipated pregnancy into account in reaching an employment decision"). Therefore, in order to prove discrimination, the EEOC must do so indirectly under the *McDonnell Douglas* framework. *See Jacques*, 96 F.3d at 511.

### A.    Plaintiff's *Prima Facie* Case

The strongest indirect evidence of discrimination that the EEOC can present arises from the timing of events. In *Katz v. City Metal Co.*, the First Circuit held that the timing of an employee's discharge can be sufficient by itself to prove a *prima facie* case of discrimination under the ADA. 87 F.3d 26, 33 (1st Cir. 1996) ("The timing of Katz's firing, one month after his heart attack, was circumstantial evidence from which the jury could find that Katz's disability triggered, in whole or in part, his firing by City Metal."). Here, Connell was terminated just one day after Drew (and Bennett, on Connell's account of the facts) learned of her PICC line.[14] Under *Katz*, that fact alone would appear to make out a *prima facie* case of discrimination.

The relevant case law, however, is something of a muddle. In *Jacques*, the First Circuit held that in order to prove a *prima facie* case, a plaintiff "must first prove by a preponderance of the evidence" that the employee either (1) "was replaced by a non-disabled person" or (2) "was treated less favorably than non-disabled employees." 96 F.3d at 511; *Ramos-Echeverria*, 659

---

[14] Even though Routh ultimately made the decision to terminate Connell, he testified that he did so with input from both Bennett and Drew.

F.3d at 186; *Rosado*, 160 F. App'x at 10.  That formulation seems to indicate that the mere timing of events is not enough to satisfy the *prima facie* standard.  *Jacques* and its progeny do not appear to overrule *Katz*—in fact, *Jacques* cites to *Katz* for the basic proposition that plaintiff can prove her case indirectly through the *McDonnell Douglas* burden-shifting method—but neither do they address or reconcile its holding.

In an attempt to satisfy the *Jacques* formulation of the *prima facie* test, the EEOC offers an affidavit from one of Connell's fellow employees, Stephanie Carr.  Carr states in her affidavit that she worked for the Franklin Village restaurant contemporaneously with Connell; that she personally witnessed five to ten new employees begin working at the Franklin Village restaurant in "the immediate weeks following Ms. Connell's termination"; that the new employees "took on the same duties as were performed by Amanda Connell"; and that none of the new employees "appeared to have any disability."  (Carr Aff. ¶¶ 6, 9-11).  The EEOC contends that the Carr affidavit establishes *prima facie* evidence that Connell was replaced by a "non-disabled person."

Whether the affidavit suffices under the *Jacques* formulation of the *prima facie* test depends on the proper application of that test.  If the EEOC must truly prove the negative—that is, prove that the employee or employees who replaced Connell were not disabled, then the Carr affidavit may be insufficient.  However, in the context of other claims, the First Circuit has consistently held that a plaintiff need not prove that the employee who replaced her was outside the relevant protected class.  *See, e.g., Cumpiano v. Banco Santander Puerto Rico*, 902 F.2d 148, 155 (1st Cir. 1990) ("Today we set any uncertainty to rest and rule that, in a case where an employee claims to have been discharged in violation of Title VII, she can make out the fourth element of her prima facie case without proving that her job was filled by a person not

possessing the protected attribute."); *Velez v. Thermo King de Puerto Rico, Inc.*, 585 F.3d 441, 447 (1st Cir. 2009) (requiring a plaintiff bringing an age-based discrimination claim under the ADEA to show only that "the employer subsequently filled the position, demonstrating a continuing need for the plaintiff's services"); *see also EEOC v. Amego, Inc.*, 110 F.3d 135, 145 n.7 (1st Cir. 1997) ("[T]he ADA is interpreted in a manner similar to Title VII."). The Supreme Court has endorsed that result in the age-discrimination context. *See O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 312 (1996) ("[T]he fact that an ADEA plaintiff was replaced by someone outside the protected class is not a proper element of the *McDonnell Douglas* prima facie case.").

Moreover, "where disability, in contrast to race, age, or gender, is at issue, the plaintiff in many, if not most, cases will be unable to determine whether a replacement employee is within or without the protected class, that is, whether or not that person is disabled or associates with a disabled person." *Ennis v. Nat'l Ass'n of Business and Educational Radio, Inc.*, 53 F.3d 55, 58 (4th Cir. 1995).[15] In other words, disability cases give rise to issues of proof that do not exist in cases based on race, gender, or age discrimination. For that reason, the court in *Ennis* held that a plaintiff in an ADA case need only prove that her "discharge occurred under circumstances that raise a reasonable inference of unlawful discrimination," and need not prove any specific characteristics of her replacement(s). *Id.*

Finally, while the timing rule from *Katz* has not been directly incorporated into the *Jacques* standard, it appears to still be good law. *See Katz*, 87 F.3d at 33. If termination one

---

[15] The court in *Ennis* noted that "[u]nder the [ADA], even the employer is generally forbidden from inquiring about the disability of an employee or prospective employee." *Ennis v. Nat'l Ass'n of Business and Educational Radio, Inc.*, 53 F.3d 55, 58 (4th Cir. 1995) (citing 42 U.S.C. § 12112(d)).

month after the plaintiff's heart attack was sufficient to establish a *prima facie* case in *Katz*, then it stands to reason that Connell's termination—one day after she revealed her PICC line to her supervisors—is also sufficient.

Under the circumstances, the combination of the timing of Connell's discharge and the Carr affidavit is sufficient to satisfy the *prima facie* standard. A plaintiff's "initial burden" in a discrimination case "is not an onerous one." *Benoit v. Technical Mfg. Corp.*, 331 F.3d 166, 173 (1st Cir. 2003) (citing *Texas Dep't of Comm'y Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). And even if the "precise requirements" of *Jacques* are not met as written, they "must be tailored to the given case," lest they become "rigid, mechanized, or ritualistic." *Swierkiewicz*, 534 U.S. at 512; *Rodriguez-Torres*, 399 F.3d at 58.

For the above reasons, the EEOC has met its burden to show a *prima facie* case of disability discrimination.

**B.      Defendant's "Legitimate, Nondiscriminatory Reason" for Termination**

The second step of the *McDonnell Douglas* analysis is relatively easy to resolve. Defendant has advanced a nondiscriminatory reason for its termination of Connell; it contends that Bennett and Routh made the decision to terminate her as a result of complaints about her attitude and poor customer service. More specifically, it contends that Bennett identified Connell as the employee referred to in the customer complaint lodged on March 23, 2012 (referring to an incident on March 11, 2012), by reviewing surveillance video footage from the day of the incident and matching her actions to those described by the customer. Defendant has put forth sufficient proof of a "legitimate, nondiscriminatory reason" to meet its burden of production under *McDonnell Douglas*. *See Dichner v. Liberty Travel*, 141 F.3d 24, 30 (1st Cir.

1998) (citing *Cumpiano v. Banco Santander P.R.*, 902 F.2d 148, 153 (1st Cir. 1990)).

### C.     Plaintiff's  Ultimate Burden of Persuasion

Once the defendant has put forth a nondiscriminatory explanation for its termination, the burden shifts back to the plaintiff to "prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000) (quoting *Texas Dep't of Comm'y Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).  At this stage, "the focus should be on the ultimate issue:  whether, viewing the 'aggregate package of proof offered by the plaintiff' and taking all inferences in the plaintiff's favor, the plaintiff has raised a genuine issue of fact as to whether the termination of the plaintiff's employment was motivated by [disability] discrimination." *Dominguez-Cruz v. Suttle Caribe, Inc.*, 202 F.3d 424, 431 (1st Cir. 2000) (quoting *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 824 (1st Cir. 1991).  Sufficient evidence that defendant's proffered explanation is false may be enough, when combined with plaintiff's *prima facie* case, to create a triable issue of fact.  *Reeves*, 530 U.S. at 148.  Ultimately, whether summary judgment is appropriate will depend on "the strength of the plaintiff's *prima facie* case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and may properly be considered." *Id.* at 148-49.[16]

The EEOC contends that defendant's proffered explanation is pretextual for essentially four reasons.

First, it points to Drew's allegedly "disgusted" facial expression in response to seeing the

---

[16] The quoted standard refers to a motion for judgment as a matter of law, but the Court clarified within that same opinion that "the standard for granting summary judgment 'mirrors' the standard for judgment as a matter of law, such that 'the inquiry under each is the same.'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250–51 (1986).

bandage on Connell's PICC line. As noted, that evidence represents nothing more than Connell's subjective interpretation of another person's feelings based on non-verbal conduct; it therefore constitutes little (if any) proof of pretext. *See Ali v. Univ. of Mass. Med. Ctr.*, 76 F. App'x 342, 343 (1st Cir. 2003) ("Although [plaintiff] appears to truly believe that he was discriminated against by [defendant] and its employees, his perception is not evidence."); *Pilgrim v. Trs. of Tufts College*, 118 F.3d 864, 871 (1st Cir. 1997) (noting that a plaintiff's "perception is not evidence" and "not enough to withstand summary judgment"), *partial abrogation on other grounds recognized by Crowley v. L.L. Bean, Inc.*, 303 F.3d 387, 406 (1st Cir. 2002).[17] Furthermore, even if it is credited as evidence, it says nothing about the motives of Routh (who made the decision to terminate whichever employee was the subject of the complaint and then affirmed the decision to terminate Connell after hearing the report about the video) or Bennett. Connell herself testified that Bennett was an "awesome boss" and that she felt he had never discriminated against her or any other employee during her employment. (Connell Dep. at 78-79).[18] And Routh, for his part, had hired Connell knowing that she had cystic fibrosis. *See Tyndall v. Nat'l Educ. Ctrs., Inc. of California*, 31 F.3d 209, 215 (4th Cir. 1994) ("An employer who intends to discriminate against disabled individuals or holds

---

[17] Connell's interpretation of Drew's facial expression is not irrelevant, but it is very weak evidence of his mental state. The same facial expression can have different meanings, depending on the context, and can be easily misinterpreted. A wincing or pained look that Connell might perceive to convey "disgust" could well have been an expression of sympathy or sorrow, or perhaps difficulty in summoning the right words. Connell herself testified that Drew "had, like, this face like 'There's something wrong with you, and I don't know how to go about talking about it.'" (Connell Dep. at 117). Indeed, his facial expression may not have been intended to express any relevant emotion at all.

[18] If there was in fact a scheme to discriminate, Bennett must have been a willing participant. If Bennett reviewed the footage himself (as he has testified), then plaintiff would ask the jury to conclude that he lied about identifying Connell on the video as a pretext for a discriminatory termination. If, instead, Drew reviewed the footage without Bennett's input, then plaintiff would ask the jury to infer that Bennett has been consistently lying about having reviewed it in order to cover up a discriminatory termination effectuated by Drew.

unfounded assumptions that such persons are not good employees would not be apt to employ disabled persons in the first place.").[19]

Second, the EEOC relies heavily on the timing of events: Connell was terminated on March 30; according to her testimony, Drew and Bennett became aware of Connell's PICC line on March 29.[21] Ordinarily, that timing would carry substantial weight; an inference of causation is strongest when two events follow closely upon one another. Here, however, there is uncontroverted evidence that on the morning of March 30, Routh became aware of the March 23 customer complaint for the first time; that he immediately instructed Bennett and Drew to conduct an investigation and terminate the relevant employee; that he did so without knowing the employee's identity; and that he did so without knowing that Connell had a PICC line. Whatever inference might otherwise be drawn from the timing of her termination is thus substantially weakened by uncontroverted evidence of the timing of other parallel events.

Third, the EEOC contends that defendant has offered "shifting explanations" for the termination decision. It is true that "when a company, at different times, gives different and

---

[19] *Tyndall* held that a "strong inference of nondiscrimination" applies "when the hirer and firer are the same person." *Tyndall v. Nat'l Educ. Ctrs., Inc. of California*, 31 F.3d 209, 215 (4th Cir. 1994); *see also Jacques v. Clean-Up Group, Inc.*, 96 F.3d 506, 512 (1st Cir. 1996) (citing *Tyndall*). That inference is not fully applicable here, because Routh made his termination decision in part based on an explanation (given by Bennett) that plaintiff contends is pretextual. However, the apparent lack of animus on Routh's part—as bolstered by the *Tyndall* inference—as a practical matter means that plaintiff must show discriminatory animus as to either Bennett or Drew or both.

[21] Connell's testimony is somewhat unclear as to whether Bennett, as opposed to Drew alone, saw her PICC line bandage. (*See* Connell Dep. at 111, 118-19). For that reason, defendant contends that there is no genuine issue of fact as to whether Bennett saw the PICC line bandage. *See Barwick v. Celotex Corp.*, 736 F.2d 946, 960 (4th Cir. 1984) ("A genuine issue of material fact is not created where the only issue of fact is to determine which of the two conflicting versions of the plaintiff's testimony is correct."). Reading Connell's deposition as a whole, however, she appears to have made the two conflicting statements in close succession and with no intervening break in questioning. Under the circumstances, it does not appear that her two conflicting statements were made "to create a material issue of fact to defeat summary judgment." *See Shahzade v. Gregory*, 930 F. Supp. 673, 676 (D. Mass. 1996) (quoting *Phiney v. Morgan*, 39 Mass. App. Ct. 202, 207 (1995)).

arguably inconsistent explanations, a jury may infer that the articulated reasons are pretextual."

*Dominguez-Cruz*, 202 F.3d at 432 (citations omitted). Plaintiff cites to a position statement submitted by defendant on August 13, 2012, which reads, in relevant part:

> Mr. Drew, having reviewed the relevant surveillance video and determined that [Connell] was responsible for the customer mistreatment described above, informed [Connell] that he needed to speak with her regarding her employment. Mr. Drew explained that Chipotle was forced to end [Connell's] employment because of her continued failure to treat Chipotle customers with the respect and decency that Chipotle expects from all employees."

(Position Statement at 6). The statement appears to contradict defendant's current position in one respect: defendant now contends that Drew relied entirely on Bennett's interpretation of the video and did not watch it himself.[22] But defendant's explanation for the hiring decision—as opposed to the identity of the person who reviewed the video—has never shifted. Defendant has consistently maintained that Connell was terminated because she was rude to a customer. The discrepancy between the position statement (presumably written by a lawyer) and the witness testimony is not irrelevant, but neither is it compelling evidence of a discriminatory motive.

Fourth, the EEOC points to the undisputed fact that the time indicated on the customer complaint was outside the hours of Connell's shift. The internal form generated by the complaint appears to indicate that the incident in question occurred at either 6:00 or 7:00 a.m. The e-mail chain read by Routh and Bennett indicated that the incident occurred at 7:00 p.m. Connell's shift on that day was from 8:29 a.m. to 4:23 p.m. According to the EEOC, that incongruity would allow a reasonable jury to infer that Bennett's account of events is pretextual. The times on the form, however, are unquestionably wrong; the restaurant was not even open to

---

[22] Bennett testified, after being shown the position statement, that he showed the footage to Drew after reviewing it himself. (Bennett Dep. at 45-46). He had previously testified that he showed the footage to "one of [his] other managers," but that he "[didn't] think it was" Routh or Drew. (*Id.* at 25).

28

the public at 6:00 or 7:00 a.m. Thus, a jury could not reasonably credit either time as accurate. There is also no dispute that the complaint concerned a female employee at the salsa station or that Connell was the only employee scheduled to work the salsa station that day. Under the circumstances, any inference that might otherwise be drawn from the discrepancy between the reported time and Connell's work hours is again necessarily attenuated.[23]

There is also substantial and undisputed evidence weighing against a finding of pretext. Routh, the manager of the restaurant, knew that Connell had cystic fibrosis when he hired her. Bennett, according to plaintiff herself, did not discriminate against her. It is undisputed that the restaurant had received multiple complaints during a short period of time about Connell's attitude and interaction with customers—the precise subject of the March 23 complaint. It is likewise undisputed that Connell had been given a written warning as to her customer service, and that she signed an acknowledgment that similar conduct in the future could lead to her termination. And there is no dispute that a customer made a complaint about a rude female employee who was working at the salsa station on March 11. Connell is female; she worked on March 11; and no one but her was expressly scheduled to work at the salsa station that day.

When management received the customer complaint on March 23, no one at Chipotle knew the identity of the employee in question. Routh sent an e-mail to the Franklin Village restaurant at 11:21 a.m. on March 30 in which he forwarded the customer complaint and instructed that "[w]e need to find out who this was and they need to be terminated." (Def's SMF ¶ 66). Bennett (or Bennett and Drew) then reviewed the video footage and concluded that the

---

[23] Even if the jury were to draw the inference that Bennett was mistaken when he identified Connell, that would not be enough for it to infer discrimination. An honest mistake (caused, for example, by Bennett's propensity to believe, based on past behavior, that Connell would be more likely than other employees to treat a customer with disrespect) would not give rise to liability under the ADA.

employee in question was Connell. Bennett and Drew contacted Routh by telephone to relay the result of the investigation, and he reiterated that she should be terminated. At 2:35 p.m., thirty-five minutes after he had arrived at work, Drew sent an e-mail to Baglieri informing him that Connell had been identified as the offending employee and that he and Bennett had processed her termination. Connell was then terminated at about 3:30 p.m., soon after she arrived at work.

If the video footage had been preserved—and if it showed what defendants contend it showed, or anything close to it—there is no question that defendants would be entitled to summary judgment. That video, however, was not preserved.[24] The question then becomes whether that fact should tip the balance.

For the jury to rule in plaintiff's favor, it would have to conclude something along the following lines: (1) the video either did not exist or clearly did not show Connell being rude to a customer; (2) Bennett and/or Drew lied about the existence or contents of the video; (3) they did so in order to create a pretext to terminate Connell; and (4) in fact Bennett and/or Drew terminated her not because of a customer complaint, but because of her disability—more specifically, because they had learned the day before about the existence of a medical procedure that Connell had undergone as part of her treatment. Presumably, the jury could also conclude that Bennett and/or Drew failed to preserve the video in order to conceal their true motive. An argument along those lines may be far-fetched, but under the circumstances—and without the video evidence—the Court cannot say as a matter of law that plaintiff cannot support it with evidence in the record.

---

[24] Plaintiff does not appear to contest that Chipotle had a video system that was capable of recording the relevant events. (Pl's SMF ¶ 69). It is unclear whether it contests the existence of the video (as of March 30), as opposed to its contents.

Thus, and notwithstanding the considerable evidence to the contrary, plaintiff "has adduced minimally sufficient evidence to permit a reasonable factfinder to conclude" that Connell was terminated due to her disability. *See Davila v. Corporacion De Puerto Rico La Difusion Publica*, 498 F.3d 9, 16 (1st Cir. 2007). Accordingly, the motion for summary judgment will be denied.

**IV.** <u>**Conclusion**</u>

For the foregoing reasons, the motion for sanctions is DENIED and the motion for summary judgment is likewise DENIED.

**So Ordered.**

/s/ F. Dennis Saylor
F. Dennis Saylor IV
United States District Judge

Dated: March 30, 2015